John D. Helvey v. Commissioner. John D. Helvey and Ruby G. Helvey v. Commissioner.
Helvey v. Commissioner
Docket Nos. 49821, 49822.
United States Tax Court
T.C. Memo 1956-123; 1956 Tax Ct. Memo LEXIS 171; 15 T.C.M. (CCH) 633; T.C.M. (RIA) 56123; May 22, 1956
*171 Fraud. - Respondent's evidence clearly showed that petitioner's returns for 1942, 1943 and 1944 were fraudulent with intent to evade tax. Fraud for 1941 not shown. Petitioners failed to show that respondent's determination of deficiencies in their income tax liability for 1942, 1943, 1944 and 1947 was incorrect. Deficiencies were determined by the net worth plus nondeductible expenditures method of determining income. Part of the deficiency in each of the years 1942, 1943 and 1944 was due to fraud with intent to evade tax. Alfred D. Howell, Esq., Liberty Bank Building, Oklahoma City, Okla., and T. D. Nicklas, Esq., for the petitioners. Robert B. Wallace, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion The Commissioner determined the following income tax deficiencies and additions to tax: Additions to Tax
Docket No.
Year
Deficiency
293(b)
291(a)
49821
(John D. Helvey)
1941
$ 309.67
$ 154.83
1942
2,820.42
1,410.21
1943
3,804.24
1,902.12
49822
(John D. and Ruby G.
Helvey)
1944
4,097.09
2,048.54
$1,024.27
1947
369.84
The issues are (1) whether the returns for the years 1941, 1942, 1943 and 1944 were false or fraudulent with intent to evade tax; if so, (2) whether the deficiencies were *172 properly determined by respondent, and (3) whether a part of any of the deficiencies for 1941, 1942, 1943 and 1944 was due to fraud; and, finally, (4) whether the addition to the 1944 tax for delinquent filing was proper. Findings of Fact John D. Helvey (hereafter called petitioner) and Ruby G. Helvey were married in 1924. They were husband and wife during the years in question, 1941 through 1947, except for a short time in 1942 or 1943 when they were divorced. They were again divorced in 1946 or 1947. Their income tax returns for all of the years in question were filed with the collector of internal revenue in Oklahoma City, Oklahoma. The returns for 1941 and 1947 were filed on time. One-month extensions for filing the 1942 and 1943 returns were granted and the returns filed within the extended period. Petitioners filed a completed return for 1944 on November 13, 1945. Petitioner was graduated from the University of Oklahoma School of Pharmacy in 1925 and is a registered pharmacist. He was 54 years old in 1955. After graduation petitioner was employed as a druggist at various places in Oklahoma. In 1927 or 1928 he went into partnership with others in the operation of a drug store *173 in Beasley, Oklahoma. He ran this store for about one year until he had an uninsured fire loss. In 1929 he went into the drug store business at Lawton, Oklahoma, with A. J. Zachary and Roy L. Zachary, the father and brother, respectively, of his wife. For the first few years business was done in corporate form and thereafter as a partnership under the name of the Lawton Drug Company. A. J. Zachary put $2,000 in the business and Roy L. Zachary put in $5,000. Petitioner managed the store. By 1932 petitioner had repaid the Zacharys their original investment and pursuant to the parties' agreement he became a partner owning a one-half interest in the business. In May 1941 petitioner borrowed $5,000 from J. T. Howard and with it bought Roy's share in the business. As security for repayment of the loan petitioner and his wife executed a mortgage on real property owned by them in Duncan and Lawton, Oklahoma. Petitioner paid $300 interest on his loan in 1941. The loan was repaid and the mortgage released in 1943. On January 1, 1943, petitioner purchased A. J. Zachary's interest for $2,000 cash. Until 1942 petitioner's salary from the partnership was $35 a week. In 1943 he received $2,000 salary. *174 The method of bookkeeping used in the business after May 1942 was for petitioner to make a daily record of sales totals from the cash registers used in various departments of the store (e.g., sundries, drugs, fountain) on take-off sheets provided by the cash register company. The take-off sheets called for other information about the day's business transactions, such as cash payouts, checks drawn, amount of bank deposits, merchandise returned and purchased, etc. Three cash registers were generally used in the store with a fourth being used for book sales at the opening of school terms. The completed daily take-off sheets and the cash register tapes were picked up by petitioner's accountant every few days and used in the preparation of the journals and ledgers kept for the business. Petitioner generally prepared the take-off sheets, handled all cash receipts and made all deposits in the company bank account. Journals and ledgers of the company's business were kept during most of the years in question by a public accountant who was not a certified public accountant but who had considerable experience in accountancy and in preparing income tax returns. In preparing daily summaries of *175 cash receipts for the business in 1942 and 1943, petitioner understated sales and entered fictitious notes payable to offset the understatement. The understated sales and fictitious notes were carried into petitioner's books by his accountant and were identified on the books by an "X" or by the initials "JPT." Sales of the drug store were understated on its books in this manner in the amounts of at least $1,400 in 1942 and $2,221.40 in 1943. As a result of these understated sales petitioner's income was substantially understated on his returns for 1942 and 1943. There were unexplained erasures and write-overs in the journal of the drug company for 1942, which reduced book sales in that year. At some times in the taxable period petitioner had a personal bank account, an account in the name of the Lawton Drug Company, and an account in the name of the Bar-B-Q Inn with the City National Bank of Lawton, Oklahoma. He also had a personal account jointly with his wife in a Duncan, Oklahoma bank. In 1942 and 1943 there were deposits in the drug company's account of $1,156.38 and $3,473.09 which were not shown as receipts on the company's books. In 1944 petitioner deposited $7,812.88 to his *176 personal account, the source of which is unidentified. A substantial part of the foregoing deposits for the years 1942, 1943 and 1944 was derived from understated sales. In 1937 petitioner inherited from his father a lot with a building on it located in Duncan, Oklahoma. He sold this property for approximately $2,500 in 1943. In 1935 petitioner purchased a lot with a house on it at 610 Dearborn Street, Lawton, Oklahoma. The latter property had a value of $3,500 and was owned by petitioner throughout the taxable period. During some of the taxable years petitioner and his wife lived at 610 Dearborn Street. There was a garage adjoining this property. In 1940 petitioner built an apartment above the garage at a cost of $2,200. In 1944 petitioner made improvements to the garage apartment costing $1,300. In 1943 petitioner purchased a lot with a residence on it at a cost of $4,000, and furniture for $600. The next year, 1944, petitioner converted the residence into a duplex apartment at a cost of $2,400. In 1944 petitioner bought a residence in Lawton, Oklahoma, which he converted into a restaurant under the name of the Bar-B-Q Inn. The property cost $4,700; the remodeling and the restaurant *177 furniture and fixtures cost an additional $3,300. Petitioner operated the Inn for slightly more than a year in 1944 and 1945. Its inventory at the close of 1944 was $785.18 and at the close of 1945, $344.54. The fixtures were sold for $5,000 in 1946. Between 1943 and 1946 petitioner bought and redeemed United States Savings Bonds as follows: Amount
Bought
Redeemed
$318.75
May-Sept. 1943
Nov. 1944
900.00
Jan. 1944
Oct. 1944
293.75
April-June 1945
Aug. 1946
From 1940 through 1947 petitioner reported on his income tax returns (filed jointly with his wife for some years) the following earnings and salary received by him: Year
Business Earnings
Salary
1940
$ 26.20 loss
1941
396.55
$1,820
1942
2,206.88
1,820
1943
2,871.00
2,000
1944
4,078.07
1945
2,431.78
1,650.50 (loss from opera-
tion of Bar-B-Q
Inn)
1946
3,094.25
1947
2,075.44
Petitioner's net worth on December 31, 1940, and the increases therein through 1947 were as follows: JOHN D. HELVEY
NET WORTH SCHEDULE
ACCOUNTS
12-31-40
12-31-41
12-31-42
12-31-43
Assets: Bank Balances: City Nat'l Bank - Lawton - Drug
$ 650.50
$ 344.75
$ 2,298.55
$ 2,350.65
City Nat'l Bank - Lawton -
Personal
Okla. State Bank - Duncan -
Personal
City Nat'l Bank - Lawton -
Bar-B-Q
Total Balance, Banks
$ 650.50
$ 344.75
$ 2,298.55
$ 2,350.65
Other Assets: Interest in Drug Store: Furniture & Fixtures
$ 1,000.00
$ 2,000.00
$ 3,838.45
$ 4,006.60
Inventory
6,000.00
10,000.00
16,608.99
20,634.92
Building & Lot, Duncan, Okla.
2,500.00
2,500.00
2,500.00
Building & Lot, 610 Dearborn St.,
Lawton, Okla.
3,500.00
3,500.00
3,500.00
3,500.00
Garage Apt. Lot, 610 1/2 Dearborn
2,200.00
2,200.00
2,225.00
2,225.00
St.
Building & Lot, 606 Dearborn,
4,600.00
Lawton
Bonds
318.75
Bar-B-Q Inn, Land & Building
Bar-B-Q Inn, Furniture & Fixtures
Bar-B-Q Inn, Inventory
Postal Savings
Buick Automobile
Notes Receivable
Total Assets
$15,850.50
$20,544.75
$30,970.99
$37,635.92
Liabilities: Notes Payable - J. T. Howard
$ 5,000.00
$ 5,000.00
Reserve Depreciation
294.50
840.92
1,315.74
Total Liabilities
$ 5,294.50
$ 5,840.92
$ 1,315.74
NET WORTH
$15,850.50
$15,250.25
$25,130.07
$36,320.18
Increase or decrease in Net Worth
$ (600.25)
$ 9,879.82
$11,190.11
*178 JOHN D. HELVEY
NET WORTH SCHEDULE
ACCOUNTS
12-31-44
12-31-45
12-31-46
12-31-47
Assets: Bank Balances: City Nat'l Bank - Lawton - Drug
$ 1,231.01
$ 2,111.41
$ 642.11
$ 1,882.50
City Nat'l Bank - Lawton -
19.21
36.24
2,170.14
2,367.31
Personal
Okla. State Bank - Duncan -
4,000.00
Personal
City Nat'l Bank - Lawton -
47.82
286.32
75.96
Bar-B-Q
Total Balance, Banks
$ 5,298.04
$ 2,433.97
$ 2,888.21
$ 4,249.81
Other Assets: Interest in Drug Store: Furniture & Fixtures
$ 5,400.25
$ 5,473.75
$ 5,976.09
$ 6,653.18
Inventory
15,689.67
15,704.00
17,244.44
17,268.20
Building & Lot, Duncan, Okla.
Building & Lot, 610 Dearborn St.,
Lawton, Okla.
3,500.00
3,500.00
3,500.00
3,500.00
Garage Apt. Lot, 610 1/2 Dearborn
3,575.00
3,575.00
3,575.00
3,575.00
St.
Building & Lot, 606 Dearborn,
7,000.00
7,000.00
7,000.00
7,000.00
Lawton
Bonds
393.75
Bar-B-Q Inn, Land & Building
6,500.00
6,500.00
6,500.00
6,500.00
Bar-B-Q Inn, Furniture & Fixtures
1,500.00
1,500.00
Bar-B-Q Inn, Inventory
785.18
344.54
Postal Savings
400.00
1.00
401.00
3,501.00
Buick Automobile
1,000.00
1,000.00
1,000.00
Notes Receivable
2,475.00
Total Assets
$49,648.14
$47,426.01
$50,559.74
$53,247.19
Liabilities: Notes Payable - J. T. Howard
Reserve Depreciation
2,125.26
3,215.78
4,194.10
5,206.27
Total Liabilities
$ 2,125.26
$ 3,215.78
$ 4,194.10
$ 5,206.27
NET WORTH
$47,522.88
$44,210.23
$46,365.64
$48,040.92
Increase or decrease in Net Worth
$11,202.70
[3,312.65)
$ 2,155.41
$ 1,675.28
*179 Petitioner realized the following taxable income in the years in question: 1941
1942
1943
1944
1947
Increase in Net
($600.25) *
$ 9,879.82
$11,190.11
$11,202.70
$1,675.28
Worth
Personal
340.62
245.26
981.51
629.14
1,648.64
Expenditures
Personal Living
2,500.00
2,500.00
2,500.00
3,000.00
3,500.00
Expenses
Taxable Income
$2,240.37
$12,625.08
$14,671.62
$14,831.84
$6,823.92
Adjustment
Income Reported
2,131.66
3,900.82
4,871.25
4,406.60
3,454.73
Unreported Income
$ 108.71
$ 8,724.26
$ 9,800.37
$10,425.24
$3,369.19
On March 15, 1944, petitioner's accountant, on behalf of petitioner, filed a form 1040 for 1944. It was signed with petitioner's name by the accountant. The only entries were on page 1, line 6, showing a tax of $500, and on line 7(A), showing a tax of $687 withheld. Written on the face of the return were the words "Est. Tax." A payment of $500 accompanied this return. A completed return for 1944 was filed by petitioner and his wife on November 13, 1945, with a payment for the rest of the tax shown to be due. On December 26, 1950, petitioners signed a consent extending until June 30, 1952, the period within which their 1947 taxes could be assessed. Another consent extending the period to June 30, 1953 was signed *180 by them on March 13, 1952. Respondent's notices of deficiency to petitioners were dated May 1, 1953. Petitioners' returns for the years 1942, 1943 and 1944 were fraudulent with intent to evade tax. Part of the deficiencies in petitioners' income tax liability for 1942, 1943 and 1944 was due to fraud with intent to evade tax. Opinion TIETJENS, Judge: Petitioner * has pleaded that the assessment of taxes for all of the years in question - 1941, 1942, 1943, 1944 and 1947 - is barred by the period of limitations provided in section 275, Internal Revenue Code of 1939. His returns for 1941 and 1947 were timely filed. Extensions of one month for filing returns for 1942 and 1943 were granted and the returns filed within the extended period. Petitioner filed a completed return for 1944 on November 13, 1945. Respondent's notices of deficiency in both dockets were dated May 1, 1953. No fraud is alleged for 1947 but petitioner executed consents extending until June 30, 1953 the period within which his 1947 taxes could be assessed. Accordingly the year 1947 is not barred by limitations. Whether the other years are still open depends on respondent's showing by "clear and convincing" evidence that *181 petitioner's returns for those years were false or fraudulent with intent to evade tax (sec. 276(a), I.R.C. of 1939). With respect to 1942 and 1943 we have little trouble in finding that respondent has met his burden of proof. He has shown that in those years petitioner in making up daily summaries of cash receipts frequently understated his receipts in substantial amounts and that in order to account for the difference between actual cash receipts, and the understatements entered on the daily summaries, petitioner entered fictitious notes payable on his records in the amounts of the understatements. These understatements of gross receipts and fictitious notes payable were knowingly carried into petitioner's books by his accountant, being identified by an "X" or by the initials "JPT," with the result that petitioner's income was understated on his returns for 1942 and 1943. Petitioner admits that his income in 1942 and 1943 was understated in the manner described but does not agree that the understatements were as great as those determined by respondent. He further claims that he was not aware at the time how the *182 understating was being done, that he had told his accountant to make it appear that his income was less than it actually was, not for the purpose of evading taxes but merely to mislead his wife. He testified that he and his wife were having difficulty in getting along, and anticipating the possibility of a divorce suit, he did not want her to know his true income and financial worth. According to the testimony of respondent's agents during their investigation petitioner never mentioned the understated sales and the explanation now given for them was not given until their discovery by the agents. Petitioner and his accountant claim that they had completely forgotten the understated sales. Respondent introduced in evidence cash register tapes and summaries prepared from these tapes, and on the summaries sales were obviously understated and fictitious notes payable entered in the amount of the understatement. The evidence disclosed and we have found as a fact that petitioner generally handled the day's cash receipts, made summaries of them, and prepared the take-off sheets. At this stage his accountant would pick up the already prepared records for entry in the company's books. In light *183 of the foregoing evidence we do not think that petitioner's testimony that he was ignorant of the understatement of sales, or his reason therefor is entitled to belief. Our view of the matter is that either petitioner himself prepared the falsified sales summaries or they were prepared under his direction; and that the purpose of the understatements was to evade taxes. With respect to 1941 we think that respondent's evidence of fraud fails to meet the required standard. His evidence relating to fraud concerned understated sales, other bookkeeping irregularities, and unexplaned bank deposits in the years 1942, 1943 and 1944. Respondent's only evidence of fraud in 1941 was an alleged slight increase in petitioner's net worth between December 31, 1940 and December 31, 1941. This increase disappeared with the adjustments which we have found should be made in the net worth statement. Accordingly respondent has failed to meet his burden of showing by "clear and convincing" evidence that petitioner's return for 1941 was false or fraudulent with intent to evade tax and that year is barred. The evidence of fraud in 1944 is as follows: Respondent's investigating agent testified that in 1944 *184 petitioner opened a bank account in his own name and deposited substantial amounts in that account; that some of these deposits could be traced through petitioner's books, while others could not. Respondent introduced in evidence a listing of the latter group prepared by him, which showed that 26 checks, totalling $7,812.88, were deposited between May and November 1944. The listing also shows deposits in this account of $1,066.19 traceable to drug store sales properly recorded in petitioner's books. Bank statements showing the actual deposit of these checks were received in evidence, and petitioner's journal and ledger for 1944 were in evidence. The agent testified that when petitioner was asked about the source of these deposits, he admitted that they were from understated sales. Next, the same investigating agent testified that in 1944 petitioner deposited $5,000 in an account in the name of "John D. Helvey or Ruby G. Helvey" in the Oklahoma National Bank, Duncan, Oklahoma, and that petitioner admitted to him that this money was derived from understated sales. A bank statement showing this deposit was received in evidence. The investigating agent testified also that although petitioner *185 was asked at the start of the investigation what bank accounts he had, he did not disclose the existence of the two accounts mentioned above. The weakness of this evidence is that it relies almost entirely on the agent's testimony of petitioner's admissions to show both that the bank deposits were derived from taxable income and that such amounts went unreported because of petitioner's fraud. In light of this fact we have carefully appraised the evidence and we are satisfied that substantial weight must be accorded the testimony of the agent concerning petitioner's admissions. This testimony was not directly contradicted; nor did petitioner deny the admission or attempt to explain its circumstances. Important in assessing the weight to be given this testimony of petitioner's admissions, we think, is that they are admissions not of an isolated instance of fraud but of the continuation of a fraudulent course of conduct admittedly engaged in the two years immediately prior to 1944. We think that the evidence of record warrants the inference that a substantial part of the unexplained bank deposits was income from sales in 1944 (cf. Goe v. Commissioner of Internal Revenue, 198 Fed. (2d) 851 *186 (C.A. 3, 1952); that failure to record this sales income resulted in a substantial understatement of income on petitioner's income tax return for 1944; and that the understatement was made with the intention of evading taxes. Having disposed of the question of fraud in the filing of the returns, we turn now to a consideration of petitioner's case in attacking the correctness of respondent's determination of deficiencies in 1942, 1943, 1944 and 1947. Petitioner contends that (a) the books and records of the Lawton Drug Company and the Bar-B-Q Inn were properly kept and accurately reflect their income for the years in question (after adjustment for the fictitious notes payable), and that (b) respondent's net worth statement is erroneous because it completely failed to take into account approximately $15,000 cash that petitioner had on hand on January 1, 1941, which went into the increase in petitioner's assets during the tax years, and because the values placed on petitioner's assets in the net worth statement were arbitrary. Petitioner's first contention is not well taken. Use of the net worth method is not necessarily conditioned on showing that petitioner's business books and records *187 are not reliable. Holland v. United States, 348 U.S. 121, 131-132 (1954), Morris Lipsitz, 21 T.C. 917, 931 (1954), affd. 220 Fed. (2d) 871 (C.A. 4, 1955). Petitioner next says that at the opening of the net worth period he had approximately $15,000 in cash in a box in his drug store safe, and that this was the source of the increases in his net worth over the taxable years in question. Partially corroborating petitioner's testimony to this effect was the testimony of his accountant that he had seen some money in the box, and the testimony of petitioner's father-in-law that petitioner was a frugal person and could possibly have saved the amount claimed. This fund, according to petitioner, was derived from saving half his salary and earnings between 1929 and 1941. For the reasons we shall set out below, we think that petitioner's claim of having about $15,000 on hand on January 1, 1941 is untrue. First, in May 1941 petitioner borrowed $5,000 to buy Roy Zachary's share of the drug business. As security for this loan he gave a mortgage on properties in Lawton and Duncan, Oklahoma. A $300 interest payment on this loan was reported on petitioner's income tax return for 1941. The facts *188 that petitioner borrowed $5,000, mortgaged property, and paid $300 interest on the loan do not of course negate his claim to having $15,000 in cash. It is merely one of the factors here which, when considered with other circumstances bearing on the likelihood of petitioner's having the amount claimed, has led us to conclude that petitioner's claim is untrue. Petitioner explained that he made the loan not from necessity, but to give his wife a false impression of his financial worth. We think this is unlikely. Second, in the period (1929-1941) that he allegedly saved $15,000 from his drug store salary and earnings, petitioner received a weekly salary of $35. The record does not show what petitioner's share of partnership earnings was after he became a partner in 1932, other than a loss of $26.20 in 1940. During all of these years petitioner supported a wife and from 1936 on, an adopted son. Also in this period, in 1935, he purchased a home at 610 Dearborn Street, Lawton, Oklahoma, which had a value in excess of $3,000. These expenditures and financial burdens make it more improbable that petitioner could have saved the amount claimed. Finally, petitioner displayed a remarkable retentiveness *189 of memory in testifying to the approximate amount of money he had in his safe some fourteen years prior to the date he testified, but when questioned about events much closer in time and seemingly much more significant, he either could not remember or was extremely vague. He was unable to remember the amounts he had in his safe in any other years. He was vague about the time of his divorce, which was in 1946 or 1947. Other than the general testimony of his accountant and his father-in-law, petitioner offered no evidence to corroborate or substantiate his testimony that he had $15,000 in his safe on January 1, 1941. There was no tabulation or other note of the amounts, and no satisfactory explanation at all of how the figure of $15,000 was arrived at. Frequently in cases of this character where a taxpayer attributes the increases in his net worth to claimed amounts of cash on hand at the beginning of the net worth period, he is unable to prove that he had on hand the amount claimed. However, it is sometimes reasonable to infer from the evidence that petitioner had some cash on hand, and in such a case fairness requires that from all the evidence we make a finding of the amount of cash *190 on hand at the beginning of the period. Here, however, there is no credible evidence from which a finding may be made. Petitioner also claims that the net worth statement is erroneous because the values of some assets were arbitrarily fixed. The burden of showing the incorrectness of respondent's determination of deficiencies is upon petitioner. This burden is not met by unsupported argument that the deficiencies are arbitrary or wrong, but by evidence which shows us where they are wrong. With certain minor exceptions that we shall discuss later, petitioner has failed to make this showing. Respondent, on the other hand, supported the net worth statement with the testimony of the investigating agents who prepared the statement. They described the nature of their investigation, the conduct of petitioner and his responses to their questions during the investigation, and explained how they determined most of the asset values that made up the net worth statement. Their testimony was generally supported by documentary evidence such as copies of conveyance deeds, a mortgage, bank statements, etc. On the basis of this testimony and documentary evidence and petitioner's cross examination of *191 respondent's witnesses, we are satisfied that the net worth statement is a fair representation of petitioner's holdings in the taxable period and the value of such holdings. We have set out in our findings of fact what these assets were and their value, and they require no discussion other than an explanation of the few changes we have made in respondent's net worth determination. We feel that it was shown on petitioner's behalf that the apartment over the garage adjoining his residence was built in 1940 instead of 1941 as claimed by respondent. We have eliminated the separate item of a cash register because we think its acquisition is reflected in the substantial increase in petitioner's inventory in 1942. Other smaller changes were made which require no comment. Respondent has determined an addition to the tax for petitioners' failure to file their 1944 return on time (section 291, I.R.C. of 1939). For this year petitioner's accountant filed the incomplete return described in the findings of fact, on which was written "Est. Tax." A payment of $500 accompanied this return. Nine months later a completed joint return for 1944 was filed, accompanied by payment of the additional tax shown *192 to be due on this return. Petitioner argues that he relied on his accountant's advice that the first return was a proper one; that such reliance is reasonable cause for the nine-month delay in filing a completed return. Petitioner's accountant testified that his reason for not filing a completed return on time was that he was busy; that upon filing the incomplete return for 1944, he told petitioner that he did not have time to prepare a complete return and that the incomplete return filed "would take care of it" until he had time to file a complete return. He also stated that he advised petitioner that the first return was a proper one. In our view, petitioner's reliance on the foregoing statements is not a reasonable cause for a nine-month delay in filing the 1944 return. Assuming that reliance on an accountant's statement that a return was a proper one would be reasonable cause (which we seriously doubt under the circumstances of this case), here the accountant's statements were not so limited. He told petitioner that a completed return was due, and it is for a delay in filing this return that petitioner is being charged with a penalty. It was petitioner's obligation as a taxpayer *193 to make certain that a proper return was timely filed. For failing to do this he was properly charged with a late filing penalty. There remains the question of the correctness of respondent's determination of the 50 per cent fraud penalty provided in section 293(b), I.R.C. of 1939. In our view the evidence discussed above in determining whether petitioner's returns for 1942, 1943 and 1944 were false or fraudulent with intent to evade tax amply supports respondent's determination that a part of the deficiency in each of those years was due to fraud with intent to evade tax. Our determination of fraud answers petitioner's allegation that respondent has improperly denied him advantage of the relief provision (section 6) of the Current Tax Payment Act of 1943, 57 Stat. 126, 145. This section specifically states that the relief provided by its subsection (a) is not available where there are additions to tax for 1942 by reason of fraud. Decisions will be entered under Rule 50. Footnotes
*. Decrease↩
*. Where appropriate "petitioner" is intended to include Ruby G. Helvey.↩